**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

JOSEPH R. SLIGHTS III
VICE CHANCELLOR

417 S. State Street
Dover, Delaware 19901
Telephone: (302) 739-4397
Facsimile: (302) 739-6179

Date Submitted: August 2, 2017
Date Decided: September 29, 2017

Sidney S. Liebesman, Esquire
Montgomery McCracken
  Walker & Rhoads, LLP
1105 North Market Street, Suite 1500
Wilmington, DE 19801

Gerald J. Hager, Esquire
Margolis Edelstein
300 Delaware Avenue, Suite 800
Wilmington, DE 19801

Re:  *Mehta v. Kaazing Corporation*
     C.A. No. 2017-0087-JRS

Dear Counsel:

To follow is the Court's post-trial decision in this matter. As you know, the

Plaintiff, Vikram Mehta, seeks to inspect certain books and records of Defendant,

Kaazing Corporation. For the reasons that follow, I have determined that Mehta is

entitled to inspect some, but not all, of the books and records he seeks.

## I. BACKGROUND FACTS

The following facts reflect my factual findings based on a preponderance of

the evidence as presented in the parties' pre-trial stipulation and order, the thirty-

four (34) joint documentary exhibits introduced at trial on August 2, 2017, and the parties' pre-trial briefing and post-trial status update.[1]

Kaazing Corporation ("Kaazing" or the "Company") is a Delaware corporation with its principal place of business in San Jose, California.[2] It "offers products that enable mobile users, applications, marketplaces and machines to connect and communicate in real-time."[3]

Mehta is a stockholder of Kaazing. He was Kaazing's Chief Executive Officer ("CEO") from October 2013 to April 2015, when he was terminated from that position by the Kaazing Board of Directors (the "Board").[4]

In early 2013, prior to Mehta's employment with the Company, the Company raised $15 million in a Series B financing round led by Columbus Nova Technology Partners ("CNTP") and New Enterprises Associates ("NEA"). Following their investments, both NEA and CNTP were represented on the

---

[1] Citations to joint exhibits are to "JX #"; to the Joint Pretrial Stipulation are to "PSO ¶"; and to the trial transcript are to "Tr. #."

[2] PSO ¶ 2.

[3] Def.'s Trial Br. 3.

[4] PSO ¶¶ 1, 9.

Company's Board.[5]  Soon after the Series B financing closed, Mehta led an additional capital raise of $6.9 million through a Series C financing round, and then arranged for a $3 million working capital line of credit with Comerica Bank.[6]

At the time of Mehta's termination, a term sheet for a $1.5 million extension to the Comerica Bank line of credit had been executed and Mehta was finalizing discussions with Intel Capital as well as a syndicate of individual investors to invest in the Series C financing round.[7]  These investments were calculated to provide an additional $7 million investment into the Series C financing round.[8]  On April 17, 2015, when Mehta was informed of his termination, he was under the impression that the Comerica Bank line of credit extension had been secured, that the documents necessary to finalize the Intel Capital investment were being prepared

---

[5] PSO ¶¶ 3–4. CNTP now has two representatives on the Board pursuant to the terms of the operative documents relating to the 2016 Series 1 Financing round. PSO ¶ 25.

[6] Compl. ¶ 9; JX 6 at 32, 35–36; JX 7 at 74–75; JX 20.

[7] JX 6 at 18, 29.  The Intel Capital investment was conditioned on NEA's and CNTP's pro-rata participation in the Series C financing round to ensure that two years' worth of operating capital would be available to the Company at the time of the closing.  *Id.* at 18, 20.

[8] *Id.* at 35–36.  The syndicate of investors was contributing $1.5 million, Intel $4 million and the Comerica Bank line was to be extended by $1.5 million.  *Id.*

by attorneys and that around $1.25 million of the syndicate investor commitment had already been wired to a Company escrow account.[9]  Despite Mehta's efforts, the Company ultimately failed to close on Intel Capital's $4 million Series C financing and did not receive the extension on the Comerica Bank line of credit.[10]

After Plaintiff's termination, Mohsen Moazami, CNTP's Managing Director, became Executive Chairman of the Board.  At that time, Kaazing also named Robert Miller ("Miller") as interim CEO and, in September 2015, appointed Miller as permanent CEO.[11]  Miller, in turn, hired Michael Floyd ("Floyd"), whom he knew from a prior business association, as Kaazing's Chief Operating Officer

---

[9] *Id.* at 35–36 ("So from where I was sitting, the company was—had six and a half million dollars in the bank, $1.25 million of a $1.5 million commitment sitting in an escrow, $4 million committed from Intel, which would have doubled, you know, another $1.5 million expansion to the working capital line.").  Mehta asserts that NEA's and CNTP's commitments, required by Intel Capital's conditions on investing, were "just a case of kicking the ball through the goalposts," and that while the documents had not been signed at the time, correspondence indicated that the commitments were certain.  *Id.* at 37, 39–40.  The Company asserts that the commitments were not certain and that the Company, under Mehta, was in fact short of the amount necessary for Intel Capital to commit its investment.  The Company also maintains that Comerica Bank had expressed concern as to the financial standing of the Company in connection with its decision not to extend the line of credit.  JX 7 at 77–78.

[10] JX 6 at 35–36.

[11] PSO ¶¶ 19–11.

in August 2015.[12]  According to Mehta, both Miller and Floyd were able to obtain unusually generous compensation packages, further harming the already financially strained Company.[13]

Mehta also asserts that, in the summer of 2015, the Company inexplicably terminated the employment of a number of Kaazing engineers who had been tasked during Mehta's time as CEO with developing an end-to-end messaging system that would have greatly advanced the Company's offerings.[14]  These employees were subsequently hired by TIBCO to the further detriment of the Company.[15]

---

[12] PSO ¶ 13, JX 7 at 23, 25.  Miller is the Founder and Chairman of Cloak Labs, a file transfer company, and Floyd is Cloak Labs' CEO.  PSO ¶¶ 12, 14.  According to the parties' stipulations, both still hold their respective positions at Cloak Labs.  *Id.*

[13] JX 6 at 80.  Mehta further asserts that the Company as a whole, with only 40–45 employees "maintained a bloated and expensive management and governance structure" with six executive officers as well as seven voting Board members and two non-voting observers.  *Id.* at 83.

[14] App. to Def.'s Trial Br. Ex. A, at MEHTA_00668; JX 6 at 60, 62.  The engineers were hired at Mehta's direction to develop a product that would allow Kaazing to reduce its customer concentration and reliance on TIBCO, a company licensing Kaazing's product.  JX 6 at 43–45.  Mehta asserts that TIBCO was positioning itself to compete with the Company and that, as Kaazing's CEO, he engaged a team of engineers in Chicago to develop processes that would allow Kaazing to offer a "more holistic" product.  *Id.* at 46.

[15] *Id.* at 60, 62.

Despite the failure to close on the investments Mehta had, in his eyes, secured prior to his termination, Miller contacted shareholders on February 28, 2016, to apprise them that the Company "ended 2015 with a very strong Q4."[16] In this communication, he further informed the shareholders of Kaazing's plans to extend its Series C financing round to raise an additional $15 million and noted that the opportunity to invest would be open to "all existing investors" with "CNTP leading the round."[17] Mehta did not receive this communication when it was first mailed.[18] After Mehta made several inquiries to the Company, Miller forwarded the communication to Mehta via email on March 29, 2016, well after others had already invested.[19]

On March 25, 2016, Kaazing delivered a vastly different message to its stockholders when it informed them of the need to engage in a $1 million bridge financing (the "2016 bridge financing") so that the Company could continue to

---

[16] JX 14.

[17] JX 19.

[18] PSO ¶ 19; JX 18.

[19] JX 18; JX 6 at 121.

operate.[20] This 2016 bridge financing was again led by CNTP which had already committed to contribute up to $500,000 through a promissory note (the "CNTP note") with the remainder of the financing opportunity to be open to other shareholders.[21] According to Mehta, the CNTP note contained terms favorable to CNTP to the detriment of the Company and its shareholders.[22] Without prior notice to shareholders, the Company's 2016 bridge financing note was thereafter amended twice to allow for investments of up to $2 million. Here again, the Company permitted CNTP to participate in the financing round prior to extending the opportunity to other shareholders.[23] In the midst of scrambling to secure bridge

---

[20] JX 6 at 118–20.

[21] JX 16. In order for other shareholders to participate in the 2016 bridge financing, those shareholders had to complete an indication of interest form, which, in Mehta's view, would cause them to relinquish their pro rata investment rights under Kaazing's Investors' Rights Agreement.

[22] Mehta claims that the 2016 bridge financing was "repayable within three months from the date of closing with an annual interest rate of eight percent . . . [and that] while any amount of the [CNTP note] was outstanding, the Company could not consummate a preferred stock financing, sale or exclusive license of all or substantially all of the assets of the Company, or execute a change of control of the Company, unless the holders of the Note (*i.e.*, CNTP) were paid an amount in cash equal to 300% of the then outstanding principal due under the [CNTP Note] plus accrued interest." Compl. ¶ 22.

[23] JX 20. Shareholders were informed of the increase by letter dated August 5, 2016. *Id.* at 2. At the time of the increase to $2 million, $600,000 were still available under the 2016 bridge financing note. *Id.* In the August 5, 2016, communication, shareholders

financing, at some point in mid-2016, Kaazing acquired Montage Studio, a software company, and thereafter employed a number of former Montage Studio employees. Stockholders were not advised of the acquisition until after the deal was signed.[24]

In July 2016, Kaazing executed a term sheet with CNTP for a Series 1 financing round (the "Series 1 Financing").[25] The Series 1 Financing was presented to shareholders in correspondence from the Company dated August 5, 2016. At the same time, shareholders were invited to participate in additional 2016 bridge financing. This communication also apprised shareholders that the Series 1 Financing would lead to a reverse stock split and recapitalization of all shares of preferred stock into common stock.[26] Given the significant impact of the Series 1

---

were informed of CNTP's commitment to participate in $250,000 and were offered participation in the remaining $350,000. *Id.*

[24] Compl. ¶ 26; PSO ¶ 41 (including "[c]losing documents for Montage Studio acquisition . . ."); *id.* ¶ 24.

[25] JX 20 at MEHTA_00013.

[26] The Series 1 Financing Term Sheet reserved investment amounts for certain Kaazing shareholders and management. JX 20 at MEHTA_00016. Out of the up to $4 million in investment opportunities, $1 million was set aside for CNTP, up to $1 million for Kaazing management (with Miller agreeing to invest at least $250,000) and $1 million for other existing shareholders. *Id.* The Term Sheet additionally required the post-financing composition of the Board to be determined by the Board and CNTP and that "[v]oting

Financing on existing shareholders, the shareholders were advised that, prior to acceptance of the CNTP term sheet, Kaazing's Board had formed a "disinterested" sub-committee which reviewed the proposed transaction and had unanimously approved the CNTP proposed term sheet.[27] Mehta asserts that, consistent with other financing rounds, the Series 1 Financing term sheet was favorable to CNTP while requiring other shareholders to waive certain shareholder rights before they could participate, effectively excluding him and similarly-situated shareholders from the opportunity.[28]

After certain shareholders (including Mehta) expressed concern regarding the impact of the Series 1 Financing on their investment, Kaazing held a shareholder meeting on September 22, 2016, to provide information concerning the Series 1 Financing.[29] During this meeting, Mehta and other similarly-situated shareholders again received an invitation to participate in the Series 1 Financing on

thresholds for amendments, waivers and approvals shall be set at a percentage of the voting securities such that CNTP shall have veto power." *Id.* at MEHTA_00018.

[27] JX 20.

[28] Compl. ¶ 25.

[29] Tr. 23, JX 6 at 10, JX 29.

the condition that they sign certain documents that Mehta believed might result in the relinquishment of shareholder rights under Kaazing's Investors' Rights Agreement.[30] For that reason, he declined to participate. The Series 1 Financing led to a dilutive conversion of Mehta's 506,124 shares of Series B-1 preferred stock to 10,616 shares of common stock.[31]

On January 10, 2017, Mehta sent a demand to Kaazing pursuant to 8 *Del. C.* § 220 (the "Demand") in which he sought inspection of certain books and records to "(i) ascertain the value of his stock; (ii) ascertain whether there has been mismanagement, waste, or wrongdoing by the Company's agents and representatives; (iii) determine what impact if any this mismanagement, waste, or wrongdoing, has had, or might have, on the value of Plaintiff's shares of the Company; and (iv) communicate with other shareholders of the Company

---

[30] JX 20 at 2, JX 16, JX 6 at 169–70, 191–93. Mehta maintains that this condition was not imposed upon all Kaazing stockholders. He further asserts that certain Montage employees that were not previously Kaazing shareholders were offered the opportunity to participate in the 2016 bridge financing prior to that opportunity being offered to other shareholders (Mehta included), thus violating his rights under the Kaazing Investors' Rights Agreement. JX 6 at 99, 108. He states that he was unable to ascertain who, in fact, participated in the 2016 bridge financing because his access to the information was denied unless he agreed to execute the Company's onerous nondisclosure statement. *Id.* at 97.

[31] JX 20, PSO ¶ 25.

concerning the above."[32] Kaazing responded by noting that the Demand did not comply with Section 220 in that it lacked the required oath, was overbroad and failed to state a proper purpose.[33] Nevertheless, Kaazing offered to make certain documents available to Mehta (and other shareholders) if they signed an appropriate confidentiality agreement. It also offered to meet and confer with his counsel to ascertain whether additional documents might be made available for inspection.[34] Mehta rejected the offer and, soon after, filed this Section 220 action on February 6, 2017.[35]

## II. ANALYSIS

Under Section 220, a shareholder seeking to inspect books and records has the burden of proving (1) that he is in fact a stockholder of the defendant company, (2) that he has complied with the Section 220 requirements concerning form, manner and making of the demand and (3) that the inspection is sought for a proper

---

[32] JX 1 ¶ 29.

[33] JX 3.

[34] JX 3.

[35] PSO ¶¶ 1, 29.

purpose. Kaazing no longer disputes the form and manner of Mehta's Demand.[36]
Instead, its defense focuses on whether Mehta has stated a proper purpose for
inspection and whether he has properly limited the scope of the documents he
seeks.

A proper purpose under Section 220 is "a purpose reasonably related to such
person's interest as a stockholder."[37] The stockholder has the burden of proving
the proper purpose by a preponderance of the evidence, and such proper purpose
must be proven for every item sought.[38] When a plaintiff seeking inspection
demonstrates a proper primary purpose, the fact that a secondary purpose may also
prompt the demand for inspection is irrelevant.[39]

Kaazing maintains that Mehta's true purpose in demanding inspection is to
gather documents not accessible to him through discovery in employment litigation

---

[36] Def.'s Am. Trial Br. 9.

[37] 8 *Del. C.* § 220 (b).

[38] *Rock Solid Gelt Ltd. v. SmartPill Corp.*, 2012 WL 4841602, at *3 (Del. Ch. Oct. 10, 2012) (citing *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1028 (Del. 1996)).

[39] *Somerville S. Trust v. USV P'rs, LLC*, 2002 WL 1832830, at *5 (Del. Ch. Aug. 2, 2002) (citing *Thomas*, 681 A.2d at 1030 n.1).

he has initiated against the Company and, more generally, to pursue a personal vendetta he has against the Company.[40] For his part, Mehta alleges in his Complaint that his purposes for seeking inspection are to:

> (i) value his membership interest; (ii) ascertain whether there has been mismanagement, waste, or wrongdoing by the Company's agents and representatives pertaining to the 2016 Bridge Financing Transactions and Bridge-Financing linked Series 1 Financing Transactions; (iii) determine what impact any mismanagement, waste, or wrongdoing has had or might have, on the value of Mr. Mehta's shareholding of the company; (iv) communicate with other shareholders of the Company concerning the above; and (v) consider possible breaches of fiduciary duties by managers and directors of the Company.[41]

Of these, at trial Mehta continued to advance as his proper purposes the valuation of his membership interest in Kaazing and the investigation of mismanagement, waste or wrongdoing.[42]

---

[40] Def.'s Am. Trial Br. 3.

[41] JX 1 at 3.

[42] Pl.'s Pre-Trial Br. 2. ("Mr. Mehta served the Demand for the proper purposes of valuing his share ownership . . . and to investigate potential waste, mismanagement and wrongdoing based on actions taken by the Company and its Board of Directors."). *Id.* While Plaintiff mentioned all purposes advanced in the Complaint at trial, he did not present any support for the additional purposes in his trial brief or closing argument. Tr. 18 (listing all Complaint purposes); Tr. 24 ("And while some of these [document requests] go to valuation, we believe all of the documents that are requested we would be entitled to even if our purpose was simply to investigate mismanagement and waste."). Plaintiff's more narrow statement of purpose is further evidenced by his more refined

It is settled in Delaware law that the valuation of one's stock can be a proper purpose for the inspection of books and records if there is a particular need or reason for the valuation.[43] In this case, however, Mehta has not demonstrated that valuing his membership interests justifies inspection since he has failed to identify any reason why he needs to value his membership interests at this time.[44]

---

requests for inspection. *See, e.g.*, *Carapico v. Phila. Stock Exch., Inc.*, 791 A.2d 787, 791 (Del. Ch. 2000) (finding that only certain document requests remained at issue after the cancellation of a merger and narrowing the purposes originally stated according to the documents still requested).

[43] *Polygon Global Opportunities Master Fund v. West Corp.*, 2006 WL 2947486, at *3 (Del. Ch. Oct. 12, 2006); *Beatrice Corwin Living Irrevocable Tr. v. Pfizer, Inc.*, 2016 WL 4548101, at *4 (Del. Ch. Aug. 31, 2016).

[44] *See, e.g.*, *Carapico*, 791 A.2d at 792–93 ("Entitlement to inspection under § 220 for a stockholder demonstrating a proper purpose is not open-ended; it is restricted to inspection of the books and records needed to perform the task.") (internal quotation marks omitted); *see also Sec. First Corp. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568–69 (Del. 1997) ("Mere curiosity or a desire for a fishing expedition will not suffice. . . . In his deposition and at trial [] [Plaintiff] admitted that he had no idea what he would do with [the information]. It is a sufficient defense for a corporation to show that a stockholder list was sought from idle curiosity.") (internal quotation marks omitted); *Helmsman Mgmt. Serv., Inc. v. A&S Consultants, Inc.*, 525 A.2d 160, 165 (Del. Ch. 1987) (finding that while it is possible that a "shareholder in a closely-held corporation needs to value his stock to enable him to decide whether or not to sell, and, if so, on what terms," "[i]t is not sufficient for [Plaintiff] merely to assert that it would like to value its A&S stock. Without a showing of a present need for such a valuation, a mere statement of that purpose, though valid in law, might not be *bona fide* in fact.").

The investigation of mismanagement, waste and wrongdoing is also a proper purpose for inspection.[45] In order to inspect books and records for these purposes, Plaintiff must present "some evidence" that provides a "credible basis" from which the court can infer possible mismanagement.[46] This threshold requirement "sets the lowest possible burden of proof," and may be met "by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[47]

With Plaintiff's low burden of proof in mind, I am satisfied that he has adequately demonstrated a credible basis to suspect wrongdoing that justifies further investigation into mismanagement. Mehta's evidence of possible wrongdoing points to Kaazing's stable financial status immediately prior to his termination and the Company's rather sudden need for bridge financing after his termination, as well as the Board's apparently contradictory statements in early 2016 regarding the Company's financial success in 2015.[48] He suggests that

---

[45] *Beatrice Corwin*, 2016 WL 4548101, at *4.

[46] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 118 (Del. 2006).

[47] *Id.* at 123 (citing *Sec. First Corp.*, 687 A.2d at 568) (internal quotation marks omitted).

[48] Pl.'s Pre-Trial Br. 25; JX 6 at 34–35, 91–92.

mismanagement took place in the form of preferential treatment of certain investors, particularly CNTP, whom he claims had control over the Board.[49] Specifically, Mehta points to the fact that he and other stockholders were boxed out of opportunities to participate in financing rounds while other shareholders were accommodated.[50]

In addition to his theory that the Board improperly gave preferential treatment to certain shareholders to the detriment of others (including himself), Mehta suggests that mismanagement or waste took place in connection with the employment agreements extended to Miller and Floyd. To support these claims, Mehta presented evidence that Miller and Floyd enjoyed a close professional

---

[49] In support of his claim, Mehta presented evidence that CNTP has two seats on the Board, that CNTP was receiving information other shareholders were not privy to, that CNTP suggested the Series 1 Financing which led to the dilution of Plaintiff's investment, and that CNTP was able to secure additional equity investments in the form of a promissory note on favorable terms in March 2016, modified in April 2016, all in violation of a pro-rata provision in the Kaazing Investor's Rights Agreement. PSO ¶¶ 20–22, JX 8.

[50] JX 6 at 99, 132, 134. In addition to the favorable treatment of CNTP, Mehta alleges that certain Montage Studio employees and affiliates were given investment opportunities in violation of his and other shareholders' rights. *Id.* at 99.

relationship at Cloak Labs,[51] and that Miller alone set Floyd's compensation.[52] Additionally, Mehta testified that Kaazing's Director of Finance expressed her view that the compensation was substantial (around $50,000 per month).[53] While this evidence by no means proves wrongdoing, the applicable standard requires Plaintiff to present only some evidence that supports a credible basis for the Court to infer the possibility of wrongdoing such that further investigation is justified. Plaintiff has crossed this low threshold here.

Having determined that Mehta has demonstrated proper purposes, I turn next to the scope of documents Mehta may inspect in pursuit of these purposes. Once a plaintiff has established a proper purpose, Delaware law provides that he is only entitled to those documents that "address the crux of the shareholder's purpose" and that are unavailable from another source, making the records necessary and essential.[54] Thus, "inspection should stop at the quantum of information that the

---

[51] PSO ¶¶ 11–14.

[52] JX 7 at 23–24.

[53] JX 6 at 77.

[54] *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014) (citing *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371–72 (Del. 2011)).

court deems sufficient to accomplish the plaintiff's stated purpose."[55]  "[I]f the stockholder already has sufficient information from other sources or as a result of other books and records requests, then the inspection can be curtailed because the additional documents are not essential."[56]

Mehta originally sought 26 categories of documents.[57]  Since the filing of the Complaint, Kaazing has produced or agreed to produce several documents within these categories, including documents placed in a data room for

---

[55] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 788 (Del. Ch. 2016).

[56] *Id.*  I note that Mehta proffered the termination of the Chicago engineering team later hired by TIBCO and the acquisition of Montage as further evidence of wrongdoing that would justify inspection.  Since those transactions do not appear to be connected to the documents he seeks to inspect (as identified in his supplemental submission), and also since it appears that he has now been provided with documents relating to those issues, I need not address those matters further.  Tr. 25 (Plaintiff stating that he is looking for closing documents for Montage Studios transaction); PSO ¶ 41 (listing "[c]losing documents for Montage Studios" as documents provided or agreed to be provided by the Company); JX 2 at 6; Status Letter 2–3 (providing the list of the six categories of documents Mehta now seeks, none of which relate to the "disbanding" of the Chicago engineers).  *See Norfolk Cnty. Ret. Sys. v. Jos. A. Banks Clothiers, Inc.*, 2009 WL 353746, at *10 (Del. Ch. Feb. 12, 2009) (finding that the plaintiff had received documents which "should suffice for the purpose" stated and that the plaintiff "must [] articulate a reasonable need for whatever additional documents it seeks."); *Polygon Global*, 2006 WL 2947486, at *3 (finding a proper purpose but denying inspection when the information was available from public filings).

[57] JX 1 ¶ 29.

shareholders to review in connection with the Series 1 Financing opportunity. These documents include the following: "409A Valuation Report – Kaazing 9/30/15, Cash Flow Q316-Q317, Unaudited Balance Sheets Q116-Q216, Unaudited Statement of Cash Flows Q116-Q216, Unaudited Statement of Operations Q116-Q216, Pro Forma Cap Table, [and the] Video tape of September 22, 2016 stockholders meeting."[58]

In addition to the data room documents, the Company has agreed to produce: communications with shareholders regarding the bridge financing and the Series 1 Financing; shareholder registers and cap tables sufficient to show shareholdings before and after the bridge financings and Series 1 Financing; Board and Board committee and subcommittee meeting materials/presentations and minutes from April 2015 through December 31, 2016; closing documents for B-1, C-1, Series 1 Financing and 2016 bridge financing (including preferred warrant agreements with SQN Capital and a subordination agreement with Comerica that were part of the bridge financing); cap tables from April 17, 2015, February 28, 2016; Miller and Floyd employment agreements and consulting agreements, including documents

---

[58] PSO ¶ 30.

describing applicable management incentive plans; unaudited quarterly and annual

financial statements (balance sheets, income statements, statements of cash flows)

for 2014, 2015 and 2016; 409A valuations for 2015 after Series C was completed;

closing documents for the Montage Studio acquisition, including any agreements

with Montage investors, founders or employees; and the presentation provided by

Miller regarding Cloak Labs.[59]

Upon the Court's request, the parties submitted a letter following closing

arguments in which they listed the outstanding document categories that remain in

dispute. There are now six disputed categories:

>     1. The General Ledger of Kaazing Corporation ("Kaazing" or the "Company") for April 2015 through December 2016.
>     2. Documents evidencing discussions Kaazing's Board and management had with COTA capital, Intel, SQN Capital, NEC, NEA, CNTP, members of the Mehta investment syndicate and any other investor that Kaazing contacted after it sent out the February 28, 2016 communication to shareholders regarding resurrection of the Series C equity financing round.
>     3. Final, signed minutes of all Board and sub-committee meetings including all materials presented at such meetings between April 1, 2015 and January 2017. If no other presentations exist and/or no other materials were handed out at meetings other than any materials already produced, a written representation that no other materials exist . . . .

---

[59] PSO ¶ 41.

4. Any Documents in addition to materials presented at Board or subcommittee meetings that were reviewed by the Company's Board of Directors and any subcommittee thereof regarding the 2016 Bridge Financing and Bridge-Financing linked Series 1 Financing and all email communications among directors, management, NEA and CNTP regarding the same.

5. All exhibits to the employment contracts for Bob Miller and Michel Floyd.

6. Documents sufficient to show the constitution of the Company's Board of Directors and all subcommittees thereof, including any changes thereto, from April 2015 through January 2017, including documentation of the reason for any such changes.[60]

To reiterate, a plaintiff is entitled only to those documents *necessary and essential* to fulfill his stated purpose and to which he does not otherwise have access.[61] Given this focus, I have determined that Mehta is not entitled to production of the general ledger under category one or documents related to the constitution of the Board under category six.

As for the general ledger, Mehta states he needs to inspect this document in order to investigate possible mismanagement, waste or wrongdoing. Specifically, he claims that inspection of the general ledger will "allow [him] to determine how

---

[60] Status Letter 2–3. "Defendant does not object to entry of an order requiring this production and representation." *Id.*

[61] *Wal-Mart*, 95 A.3d at 1271.

and where Kaazing was spending money, to determine what information was obtained prior to entering into transactions and to identify any potential conflicts of interests between Kaazing's managers and affiliates and third parties."[62] As an initial matter, the investigation into "how and where Kaazing was spending money," without more, is legally insufficient to justify inspection because it reflects a general curiosity rather than a purpose to investigate possible mismanagement.[63] But more to the point, the production of the general ledger in all of its detail is simply not justified here given the extensive financial documents already provided or agreed to be provided in the form of Board minutes, transactional documents and internal financial statements.[64]

---

[62] JX 4 at 18.

[63] *See City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 287 (Del. 2010) (citing *Seinfeld v. Verizon Commc'ns, Inc.*, 2005 WL 3272365, at *2–3 (Del. Ch. Nov. 23, 2005), *aff'd*, 909 A.2d 117 (Del. 2006)) (describing the "credible basis standard as striking the appropriate balance between (on the one hand) affording shareholders access to corporate records that may provide some evidence of possible wrongdoing and (on the other) safeguarding the corporation's right to deny requests for inspection based solely upon suspicion or curiosity. Thus, a mere statement of a purpose to investigate possible general mismanagement, *without more,* will not entitle a shareholder to broad § 220 inspection relief.").

[64] PSO ¶ 41; Tr. 28. *Doerler v. Am. Cash Exch., Inc.*, 2013 WL 616232, at *5 (Del. Ch. Feb. 19, 2013) (noting that the Court has the "responsibility to ensure that the plaintiff has tailored his demand to the inspection to documents that are *reasonably required* to satisfy the purpose of the demand" and holding that "the stockholder must tailor his

Nor is Plaintiff entitled to the documents requested under category six: "[d]ocuments sufficient to show the constitution of the Company's Board of Directors and all subcommittees thereof, including any changes thereto, from April 2015 through January 2017, including documentation of the reason for any such changes." The stated purpose to inspect these records is "to ascertain whether Kaazing's Board was disinterested during the approval process of the transactions at issue in this matter . . . [,] to determine whether the Company's Board failed to

---

demand to documents that are necessary and essential to his proper purpose."). I note that this case is distinguishable from *Doerler,* where the court determined that inspection of the general ledger was justified. There, the plaintiff claimed that the controlling stockholder of the defendant company was using company accounts and funds for personal purposes on a daily basis. *Doerler*, 2013 WL 616232, at *7. Defendants presented no evidence to refute the claim. *Id.* Given the substantial number of transactions at issue, and the lack of refuting evidence, the court determined that the general ledger was necessary and essential to investigate the alleged commingling of funds. *Id.* at 6, 8. Mehta has made no such allegations here. Instead, the information he seeks relating to the discreet transactions he has identified, including the alleged potential conflicts, can be readily gleaned from records Kaazing has already committed to produce. Furthermore, while Mehta states that he requires the general ledger in order to investigate "how the Company was spending its resources, and whether expenditures were proper or were in the form of excessive bonuses or payments," he has not presented any discrepancies with regard to the Company's finances, despite having been provided with several financial documents from which he would have gleaned such evidence if it existed. *See, e.g.*, *Norfolk Cnty. Ret. Sys.*, 2009 WL 353746, at *10 ("[Plaintiff] could have studied the documents provided by the Company to show how these documents are insufficient or how other documents are necessary. Yet, [Plaintiff] failed to do so. . . . Thus, I conclude the Company has produced all the documents required under § 220.").

establish a proper governance structure, whether the Board was illegally reconstituted on April 13, 2015, whether a sub-committee of the Board was set up after approval of certain transactions, and whether the subcommittee was staffed with disinterested directors."[65] Here again, while the stated purpose is proper, the documents requested by Mehta are not necessary and essential to pursue that purpose in light of the documents Kaazing has already committed to provide.[66] The directors' interests, the governance structure as well as the creation and disinterestedness of the subcommittee can all be discerned from the Board and sub-committee meeting minutes that the Company will produce under category three. There is simply no need for the Company to produce more.

The balance of the categories identified in the parties' status letter are sufficiently targeted and narrow to justify inspection. As noted, Kaazing has already agreed to produce Board materials.[67] Plaintiff is also entitled to category two documents: "[d]ocuments evidencing discussions Kaazing's Board and

---

[65] JX 4.

[66] PSO ¶¶ 30, 41.

[67] Status Letter 2. "Defendant does not object to entry of an order requiring this production and representation." *Id.*

management had with COTA capital, Intel, SQN Capital, NEC, NEA, CNTP, members of the Mehta investment syndicate and any other investor that Kaazing contacted after it sent out the February 28, 2016 communication to shareholders regarding resurrection of the Series C equity financing round." Mehta seeks to inspect these documents in order to investigate mismanagement, waste or wrongdoing and particularly to determine "whether Miller, Kaazing's Board of Directors and CNTP were providing preferential treatment to certain shareholders while withholding information from Plaintiff and other similarly-placed shareholders . . . [as well as to] investigate what Kaazing and its representatives did to ensure that Plaintiff and other similarly-situated shareholders were not being disenfranchised."[68] Based on the evidence presented and outlined above, as well as the specified listing of communications requested, Plaintiff has demonstrated a credible basis to investigate the mismanagement of the Company as it pertains to the preferential treatment of shareholders and the requested documents are sufficiently targeted to advance that purpose.

---

[68] JX 4 at 11.

Plaintiff is also entitled to the fourth category of documents requested for the same reasons he is entitled to inspect documents in category two. The category four documents encompass "[a]ny documents in addition to materials presented at Board or subcommittee meetings that were reviewed by the Company's Board of Directors and any subcommittee thereof regarding 2016 Bridge Financing and Bridge-Financing linked Series 1 Financing and all e-mail communications among directors, management, NEA and CNTP regarding the same."[69] Having found a proper purpose for this information, I can see no basis to conclude that the scope of this request is overly broad or burdensome and Kaazing has offered none.

Finally, Plaintiff is entitled to the fifth category of records requested to the extent such records exist. Category five documents include "[a]ll exhibits to the employment contracts for Bob Miller and Michel Floyd." As per the Joint Stipulation and [Proposed] Order entered by the Court on July 26, 2017, the parties stated that the Company agreed to produce "Bob Miller[s] and Michael Floyd[s] employment agreements and consulting documents, including documents

---

[69] Status Letter 2.

describing applicable management incentive plans."[70] To the extent other exhibits are appended to the employment agreements, Mehta is entitled to inspect them.

### III. CONCLUSION

The parties shall confer and submit an implementing order within ten (10) days. In addition to providing for the production of the documents as directed herein, the implementing order shall also provide that Kaazing will provide a certification of its compliance with any and all previous agreement(s) to produce documents and of the completeness of the production(s).

Very truly yours,

*/s/ Joseph R. Slights III*

---

[70] PSO ¶ 41.